**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**
    **Plaintiff,**

**v.**                                                        **Criminal Action No: 1:10cr91**

**RICKY FRASHURE,**
    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 13th day of January 2011, came the defendant, Ricky Frashure, in person and by L. Richard Walker, his attorney, and also came the United States by its Assistant United States Attorney, Zelda E. Wesley, for a hearing on Defendant's Motion to Suppress, which motion was filed on December 20, 2010 (Docket Entry 12). The United States filed its Response to the Motion on December 29, 2010 (Docket Entry 14). The matter was referred to the undersigned United States Magistrate Judge on December 22, 2010, by United States District Judge Irene M. Keeley (Docket Entry 13).

### I. Procedural History

On November 4, 2010, Defendant was Indicted by a Grand Jury seated in the Northern District of West Virginia at Clarksburg (Docket Entry 1). He was charged in the Indictment with One Count of possession of a firearm by a convicted felon. The Indictment also contains a forfeiture clause.

Defendant was arraigned on December 3, 2002. The motion before the Court was filed on December 20, 2010.

### II. Contentions of the Parties

Defendant contends the Indictment is the product of a bad investigative traffic stop.

The Government contends the officer had "reasonable suspicion" to stop and briefly detain Defendant for investigative purposes.

### III. Statement of Facts

The Court received the testimony of two witnesses under oath, to wit: Gilmer County Sheriff's Deputy Larry Gerwig and West Virginia State Trooper John Smith. The Court also admitted into evidence five exhibits, including a CD copy of the 911 call; the search warrant; a non-certified transcript of the 911 call provided by Defense counsel; a photograph of the "33 Club" where the traffic stop took place; and a photograph of the license plate of the vehicle driven by Defendant on the date at issue.

From the evidence and testimony presented, the Court makes the following findings of fact:

On October 2, 2008, Deputy Gerwig was working at the Sheriff's Department when he received a 911 dispatch. He was in the Normantown area of Gilmer County. The 911 dispatch went out to all available officers and stated that a caller had informed 911 that a maroon and tan Chevy truck with an expired registration was traveling at an excessive speed down Ellis Creek Road and Sand Fork Road. The driver had no license and was possibly intoxicated.

Deputy Gerwig testified that based on the description of the vehicle and the area in which it was traveling provided by the 911 dispatcher, he had an idea that the driver might be Defendant. He already knew Defendant did not have a driver's license, and the 911 operator said the driver did not have a license. Deputy Gerwig drove onto Route 33 because he knew Ellis Creek Road came out onto that route. He met "the truck" described by the 911 dispatcher going in the opposite direction. He knew the vehicle itself and knew it was a truck Defendant owned. The road where he passed the truck was a two-lane road, outside of town, with some residences. He passed the truck, then turned

around to follow it from behind. He did not recall how far he had gone down Rt. 33 before he caught up with the truck. He was not sure how far he had had to go in order to turn around. After he turned around he could see the truck. It was not going at an excessive speed, he did not see any moving violations, and he could not see who was driving. He was within a couple of car lengths with no vehicle in between his cruiser and the truck. He did not recall having to pass other vehicles to get behind the truck. He noticed the license plate and noted it had expired, as the dispatcher had advised. He initiated a traffic stop and Defendant stopped at the first available place, the "33 Club."

Deputy Gerwig could not recall how long he had followed the truck before he turned on his lights. He testified he did not usually initiate a traffic stop until he knew there was a safe place for the driver to stop. He testified he put his lights on "real shortly" before the 33 Club so the driver could pull in there. The vehicle turned into the club at almost the same time he turned his lights on but surprised Deputy Gerwig by driving around the back of the club, despite there being open area in the front.

Deputy Gerwig walked up to the truck and verified the driver was Defendant. He asked Defendant if he had his license back, and Defendant replied that he did not. He asked Defendant to step out of the car, which he did. He could smell alcohol on Defendant's breath.

West Virginia State Trooper Smith then arrived on scene and began talking to Defendant, who was either in or near Trooper Smith's cruiser at that time. Deputy Gerwig then walked up to Defendant's vehicle and saw the firearm "kinda tucked down into the back of the front seat." He did not question Defendant about the firearm. He took the firearm out of the vehicle and brought it to Trooper Smith. At that point it was Trooper Smith's investigation.

Upon cross examination, Deputy Gerwig testified that he could tell the license plate was

3

expired by the first number on the actual plate, which he recalled was either 5 or 8, combined with the sticker in the lower right hand corner, which was orange. An orange sticker indicated the car was registered in 2008. A 5 on the plate would indicate it was registered in May, and an 8 would indicate August, 2008. The stop took place in October 2008, therefore it did not matter whether it had expired in May or August. Deputy Gerwig testified he took no notes, but communicated with Trooper Smith, who did have a written report. He believed he told Trooper Smith the vehicle's registration was expired, but could not be certain if he had communicated that fact.

Defense counsel then inquired about the registration, asking Deputy Gerwig if he had told the investigator for Defendant that he had probably noticed the expired sticker when Defendant pulled into the club. Deputy Gerwig testified it was possible he had told the investigator that, but he also testified that Defendant pulled into the club at almost the same time he had turned on his lights. Defendant turned into the club almost simultaneously with Deputy Gerwig activating his lights. He could not recall with 100% accuracy, however, exactly when he saw the expired sticker, but insisted he saw it before he put on his lights. He was turning on his lights as Defendant was pulling into the club.

Deputy Gerwig testified he believed that the dispatcher call informing him of a possible intoxicated driver was probable cause for him to stop that vehicle, and that he would have stopped the vehicle even if the sticker had not expired. He did not, to this day, know who placed the 911 call, but had reason to believe it was someone who lived in the area and observed the vehicle. He was not aware that Defendant was not well liked, did not know anyone had an "ax to grind" against Defendant, and did not know if he had any enemies. He testified Defendant had always been respectful to him. Deputy Gerwig testified the 911 dispatch was to "any available law enforcement."

4

Based upon the call he was looking for certain criteria: a maroon and tan tuck with an expired plate and a possibly intoxicated driver.

Upon redirect, Deputy Gerwig was expressly asked if he noticed the expired registration prior to putting on his lights, to which he testified, "Yes, Ma'am." Counsel for Defendant then asked Deputy Gerwig if he noticed the registration of every vehicle he pulled up behind, to which he responded, "Yes." He testified he was in the habit of noting every license plate on every car he was behind, even when he was off duty. He testified he did intend to pull over the vehicle even if he had not noticed the expired registration, in that he believed a dispatch regarding a possibly intoxicated driver was probable cause to make a traffic stop.

Trooper Smith testified that on October 2, 2008, he received a 911 dispatch relative to a person driving, possibly intoxicated, with no driver's license or registration. From the description of the vehicle and the location he "had an idea" it was Defendant. He had had past trouble with Defendant. He was familiar with the vehicle from past 911 calls to Defendant's residence. He was also aware that Defendant was not permitted to operate a vehicle. When he received the 911 dispatch, he also heard Deputy Gerwig state he was trying to catch up to the vehicle from behind. He pulled into the 33 Club a minute or two after hearing Deputy Gerwig report he made a traffic stop. When he arrived, Defendant was already out of the vehicle. Trooper Smith performed a field sobriety test on Defendant, which he testified Defendant failed. He also testified Defendant smelled of alcohol, and also reported having taken several medications prescribed for him. Trooper Smith noticed the registration was "dead," as the sticker was orange and the first number on the plate was 5, indicating it had expired in May, 2008. He photographed the license plate, which photograph was admitted without objection during the hearing.

5

Trooper Smith testified that as he was talking with Defendant, Deputy Gerwig said, "Hey, there's a weapon in Ricky's vehicle." Trooper Smith asked Defendant for consent to retrieve the gun, and testified that Defendant gave consent. Deputy Gerwig brought the gun over, and Trooper Smith ran the serial number. Nothing came back on the weapon. After he was finished with the field sobriety test, Defendant requested the gun be placed behind the front seat of the vehicle, which the officers did. Trooper Smith testified that after he got back to his barracks, he discovered Defendant was a registered sex offender and had had a felony conviction. He then obtained a search warrant for the vehicle to obtain the firearm, returned to the 33 Club, and retrieved the firearm.

Upon cross examination, Trooper Smith testified that dispatch did not mention who was driving the vehicle. He had an idea, but did not know for certain. Even if it was Defendant's truck, he conceded it may not have been Defendant driving. He understood from the dispatch that someone, possibly intoxicated, was driving a vehicle with no insurance and expired registration. He believed that was enough to make a stop. He would have stopped the vehicle based only on that information. He was only looking for that vehicle due to the dispatch. He pulled into the 33 Club, and parked behind Defendant's vehicle. He saw the expired registration, noting the plate began with the number 5 and the sticker was orange, indicating May 2008. He did not confirm that the registration had expired. He did not give Defendant a ticket for having an expired registration. He arrested him for driving on a license revoked for three DUI's and for having no insurance. He testified he believed "that was enough." He did not know when Deputy Gerwig noticed the expired registration and did not know if the deputy ever mentioned to him when he first noticed it.

## IV. DISCUSSION

The issue in this case is whether the dispatch itself, notifying officers of a possibly

6

intoxicated driver with an expired registration and revoked license, was enough to effect the traffic stop, and, if not, whether Deputy Gerwig otherwise had "reasonable suspicion" to stop and briefly detain Defendant for investigative purposes.

An officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119 (2000); United States v. Sokolow, 490 U.S. 1 (1989); Terry v. Ohio, 392 U.S. 1 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inference to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002); United States v. Crittendon, 883 F.2d 326 (4th Cir. 1989). The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151 (4th Cir. 1993). Accord Arvizu, 534 U.S. at 273. (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") internal quotation omitted. "[T]he reasonable suspicion standard defies precise definition, [but] it is less demanding than probable cause and falls considerably short of satisfying a preponderance of the evidence standard." United States v. Griffin, 589 F.3d 148 (4th Cir. 2009).

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. McCoy, 513 F.3d 405 (4th Cir.) Cert. Denied, 128 S.Ct.2492 (2008); United States v. Harris, 39 F.3d 1262 (4th Cir. 1994); United States v. Turner, 933 F.2d 240 (4th Cir. 1991). On the other hand, neither an officer's reliance on a "mere hunch," Arvizu,

supra at 274, nor an uncorroborated anonymous tip, is sufficient to establish reasonable suspicion. Accord Florida v. J.L., 529 U.S. 266 (2000); United States v. Reaves, 512 F.3d 123 (4th Cir. 2008)(anonymous tip that there was a gun in a vehicle, including accurate description of vehicle and its location, insufficient to establish reasonable suspicion) ; and United States v. Jones, 242 F.3d 215 (4th Cir. 2001)(vehicle stop based on uncorroborated anonymous tip held unconstitutional, suppressing evidence and vacating conviction.) Whether an anonymous tip is sufficiently reliable to establish reasonable suspicion depends upon the totality of the circumstances. See, e.g., Reaves, 512 F.3d at 126.

Regarding vehicles in particular, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. United States v. Branch, 537 F.3d 328 (4th Cir. 2008). Further, "once a motor vehicle has been lawfully detained [even] for a traffic violation, the police may order the driver to get out of the vehicle without violation the Fourth Amendment's proscription of unreasonable searches an seizures." Ohio v. Robinette, 519 U.S. 33 (1996).

Defendant argues that Deputy Gerwig stopped Defendant on "very meager evidence," consisting of a 911 call that carried no indicia of reliability regarding its assertion of illegal activity, and therefore could not establish reasonable suspicion.

Upon consideration of all of the above, the undersigned finds that Deputy Gerwig's notice of the expired license plate before effecting the traffic stop provided him with "sufficient justification" to do so. Branch, supra. The undersigned permitted Defendant additional time to submit post-hearing argument or evidence regarding this issue. Counsel did not supplement his brief by the deadline offered and granted by the Court, however, and the issue is ready for decision.

8

The undersigned finds Deputy Gerwig's testimony was credible. Although he could not remember exactly how far he drove before he met the truck, where exactly he made the U-Turn, or when precisely he turned on his lights, he consistently testified that he observed the expired sticker and license plate before he effectuated the actual stop. He further testified that he invariably looks at license plates when traveling behind a vehicle, even when not on duty. The undersigned finds it is, in fact, not difficult to determine the month a vehicle registration expired in West Virginia. The first digit on the actual license plate indicates the month the vehicle was registered and the color of the sticker indicates the year. In this case, the orange sticker and 5 on the plate indicated the vehicle registration expired after May 2008. Defendant was stopped in October 2008.

Nor does the fact that Deputy Gerwig testified he would have stopped the vehicle even if he had not seen the registration change the result. As long as he observed that the vehicle registration was expired before effecting the traffic stop, he had reasonable suspicion to do so.

The undersigned therefore finds, based on Deputy Gerwig's credible testimony, that he saw the expired license plate prior to effecting the traffic stop. He therefore had reasonable suspicion to stop Defendant. Once Defendant had been stopped for the expired registration, it is undisputable that the officers would have determined Defendant was driving while his license was revoked for 3rd offense DUI. Defendant also failed the field sobriety test. Defendant has not disputed the firearm was observed in plain view on the front seat of the truck. Nor has Defendant argued that the subsequent search warrant was defective, or that he had a right to possess the firearm.

The undersigned United States Magistrate Judge therefore finds no Fourth Amendment violation, and recommends Defendant's Motion to Suppress be denied.

Even if Deputy Gerwig had not observed any violations prior to effecting the traffic stop, the undersigned finds he still had reasonable suspicion to stop Defendant's vehicle. In U.S. v. Perkins, 363 F.3d 317 (4th Cir. 2004), although the Fourth Circuit. Although the Fourth Circuit in Perkins found the officer had guessed the anonymous informant's identity, it also stated: "Even if the tip is deemed 'anonymous,' we still conclude that officer Burdette had reasonable suspicion to stop Perkins' vehicle." The court distinguished the case from J.L. and White, finding "the need to focus on predictive information in order to corroborate an anonymous tip, while perhaps present in White and J.L. does not exist in this case. In both White and J.L., the tip alleged concealed and possessory criminal activity. The nature of a status crime such as possession of a concealed firearm may require corroboration of the extent to the tipster's inside information, in order to ensure that the tipster was in a position to know about the alleged illegal conduct." The court further stated:

> Here, by contrast, the tip alleged that two males were displaying and pointing rifles in various directions in a residential neighborhood. The caller in this case was clearly in a position to know about the reported activity that gave rise to Officer Burdette' suspicion. In this different context, where the suspicious activity is openly and readily observable, other manners of corroborating a tip are entirely legitimate. Cf. United States v. Wheat, 278 F.3d 722, 734 (8th Cir. 2001)("unlike with clandestine crimes such as possessory offense, . . . where corroboration of the predictive elements of a tip may be the only means of ascertaining the informant's basis of knowledge, in erratic driving cases the basis of the tipster's knowledge . . . comes from his eyewitness observations, and there is no need to verify that he possesses inside information.

The Fourth Circuit noted the Defendant's objection that permitting reliance upon anonymous tips may lead to problems of mischief and harassment, as individuals can fabricate reports to the police as pranks or as a way of harming their enemies. The court found this danger is obviated, however, by the requirement in J.L. that a tip must carry sufficient indicia of reliability in order to

10

be part of an officer's basis for reasonable suspicion. Where an officer is able to verify the reliability of a tip before acting upon it, the dangers of harassment are greatly minimized. The court further found:

> There is the equal danger, moreover, that according no weight to "anonymous tips in the reasonable suspicion calculus will undermine the ability of concerned residents to report illegal activity and to thereby make their neighborhoods more safe. Residents of neighborhoods are in the best position to monitor activity on the streets. But residents, also fearful of the consequences, may not always wish to identify themselves and volunteer their names. According no weight as a matter of law to such "anonymous" tips would only discourage concerned residents from even calling the police, would burden the rights of ordinary citizens to live in their neighborhoods without fear and intimidation, and would render citizens helpless in their efforts to restore safety and sanctity to their homes and communities.

Id. at 326.

U.S. v. Wheat, 278 F.3d 722 (8th Cir. 2001), cited with approval in Perkins, is the only Federal Circuit Court of Appeals the undersigned found which addressed the exact issue. That court framed the issue as follows:

> The question we now face is whether, in light of J.L., an anonymous tip about the dangerous operation of a vehicle whose innocent details are accurately described may still possess sufficient indicia of reliability to justify an investigatory stop by a law enforcement officer who does not personally observe any erratic driving.

The court then noted that the State Supreme Courts of Vermont, Iowa, and Wisconsin had already held that J.L. "Does not prevent an anonymous tip concerning erratic driving from acquiring sufficient indicia of reliability to justify a Terry stop, even when the investigating officer is unable to corroborate that the driver is operating the vehicle recklessly and therefore unlawfully. The court noted that in a Vermont case, State v. Boyea, 765 A.2d 862 (2000), cert. denied, 533 U.S. 917 (2001), the court affirmed the denial of a motion to suppress where the investigating officer's sole initial basis for detaining the motorist was an anonymous tip, relayed by a police dispatcher,

11

describing a "blue-purple Volkswagen with New York Plates, traveling south on I-89 in between Exits 10 and 11, operating erratically." Id. at 863, 868. The court admitted the case was close, but found that the accurate description of the vehicle and correct prediction of its location, just minutes before the stop, gave the tip greater reliability than the bare-bones tip in J.L. The court further found that "[i]n contrast to the report of an individual in possession of a gun, an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action." Id. at 867. Further, whereas police confronted with a report of a concealed gun could quietly observe the suspect for a reasonable period of time without running the risk of death or injury with every passing moment [, an] officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury." Id.

The Eight Circuit also cited State v Walshire, 634 N.W.2d 625 (Iowa 2001), in which that court found that because a tip about erratic driving described not concealed criminal activity, as in J.L., but rather "illegality open to public observation," it therefore "demonstrated the tipster's basis of knowledge" and its reliability could be demonstrated through corroboration of innocent details." Id. at 627-28.

Finally, the Eighth Circuit considered State v. Rutzinski, 623 N.W.2d 516 (2001), in which an anonymous caller described a black pickup truck that was driving erratically. Although the investigating officer did not personally observe such erratic driving, the court affirmed the denial of the motion to suppress, in part, because the tip in question "posed an imminent threat to the public's safety." Id. The court emphasized that it did not advocate a blanket exception to the reliability requirement for tips concerning alleged drunk driving, but at the same time clearly stated that the "extraordinary danger" of drunk driving meant that any allegation therefore had to be seriously

considered in weighing the totality of the circumstances. Id. at 751.

The undersigned also notes Chief Justice Roberts' dissent from a denial for a writ of certiorari in Virginia v. Harris, 130 S.Ct. 10 (2009). In Harris, the Virginia Supreme Court reversed a drunk driving conviction because the officer's reliance on an anonymous tip to perform a traffic stop violated the defendant's Fourth Amendment rights. In his dissent, Chief Justice Roberts wrote:

> By a 4-to-3 vote, the Virginia Supreme Court below adopted a rule that will undermine . . . efforts to get drunk drivers off the road. The decision below commands that police officers following a driver reported to be drunk do nothing until they see the driver actually do something unsafe on the road – by which time it may be too late.
> . . . .
> [I]t is not clear that J.L. applies to anonymous tips reporting drunk or erratic driving. J.L. itself suggested that the Fourth Amendment analysis might be different in other situations. The Court declined "to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." Id., at 273, 120 S.Ct. 1375. It also hinted that "in quarters where the reasonable expectation of Fourth Amendment privacy is diminished," it might be constitutionally permissible to "conduct protective searches on the basis of information insufficient to justify searches elsewhere." Id. at 274, 120 S.Ct.1375.
> There is no question that drunk driving is a serious and potentially deadly crime, as our cases have repeatedly emphasized . . . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases. In a case like J.L., the police can often observe the subject of a tip and step in before actual harm occurs; with drunk driving such a wait-and-see approach may prove fatal.
> . . . .
> In the absence of controlling precedent on point, a sharp disagreement has emerged among federal and state courts over how to apply the Fourth Amendment in this context. The majority of courts examining the question have upheld investigative stops of allegedly drunk or erratic drivers, even when the police did not personally witness any traffic violations before conducting the stops.

Perhaps more significant than his actual dissent, however, is the Chief Justice's finding that the majority of courts which had decided the issue found against suppression. He cited to Wheat, supra; People v. Wells, 136 P.3d 810 (Cal. 2006), State v. Prendergast, 83 P.3d 714

13

(Hawaii 2004); State v. Walshire, 634 N.W.2d 625 (Iowa 2001); State v. Crawford, 67 P.3d 115 (Kan. 2003); Bloomingdale v. State, 842 A.2d 1212 (Del. 2004); State v. Golotta, 837 A.2d 359 (2003); State v. Boyea, supra; State v. Scholl, 684 N.W.2d 83 (S.D. 2000); and State v. Rutzinski, 623 N.W.2d 516 (Wis. 2001).

Here Deputy Gerwig was provided a description of the truck and the route the driver was taking. From that description he believed the driver was Defendant. He knew Defendant had no license. He was informed by dispatch that the driver was drunk and driving at an excessive rate of speed. He knew from Defendant's history that his license had been revoked for DUI's. After he met up with the truck, he believed it to be Defendant's, an individual whom he knew had no license and had several drunk driving convictions. The undersigned finds that a totality of the circumstances, that Deputy Gerwig had sufficient reasonable suspicion to stop the truck even if he had not seen the expired license plate.

## V. Recommendation

For the reasons herein stated, the undersigned accordingly recommends Defendant's Motion to Suppress (Docket Entry 12) be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th

Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 20th day of January, 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE